IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **BROAD STREET ENGERGY CO.,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | **Case No. 2:12-CV-711** |
| **v.** | **:** | |
| | **:** | **JUDGE ALGENON L. MARBLEY** |
| **ENDEAVOR OHIO, LLC,** | **:** | |
| | **:** | **Magistrate Judge Deavers** |
| **Defendant.** | **:** | |
| | **:** | |

## OPINION & ORDER

This matter is before the Court on the Motion of Plaintiff Broad Street Energy Company ("Broad Street" or "Plaintiff") for Summary Judgment against Defendant Endeavor Ohio ("Endeavor" or "Defendant").  (Doc. 15.)  For the foregoing reasons, Plaintiff's Motion is **DENIED.**

## I. BACKGROUND

Broad Street is an Ohio oil and gas operator that holds title to various mineral rights, oil and gas leases, easements, facilities, and other interests in lands and assets. In April 2012, Endeavor, the "Buyer," entered into contract with Broad Street, the "Seller," to purchase large portions of its land, oil, and gas assets for $35 million dollars (the "Purchase Price"). The parties executed this purchase and sale agreement ("PSA" or the "Agreement") on April 9, 2012. Closing was scheduled to occur 120 days after the execution of the PSA, or on August 7, 2012.

### 1. Relevant Contract Provisions

Article IV of the PSA governs "Title, Environmental, and Easement Matters." Section 4.2 of the Agreement addresses "Title Defects." Pursuant to Section 4.2(a), "[i]n order to assert a Title Defect, Buyer must deliver to Seller a written 'Title Defect Notice,'" conforming to certain

requirements, "as soon as possible but not later than 30 days prior to the Closing Date in

connection with each Title Defect (the 'Title Claim Date')." *Id*. at § 4.2(a).[1] Pursuant to Section

4.2(b), following issuance of a Title Defect Notice, Broad Street was entitled to cure any title

defects prior to Closing. Section 4.2(b) further provides for an adjustment to the Purchase Price

for certain properly-noticed, unwaived, uncured title defects. *Id*. at § 4.2(b).[2]  Finally, Section

4.2(c) provides that, "[n]otwithstanding anything to the contrary in this Agreement, Buyer shall

be deemed to have waived any Title Defect as to which Buyer has not delivered to Seller a title

---

[1] Section 4.2(a) of the PSA provides, in full:

> (a) Notice of Title Defects. In order to assert a Title Defect, Buyer must deliver to Seller a written "**Title Defect Notice**" as soon as possible but not later than 30 days prior to the Closing Date in connection with each Title Defect (the "**Title Claim Date**"). Each Title Defect Notice must be in writing and must satisfy the following conditions precedent: (i) identification of the affected Asset or Assets; (ii) a description of each Title Defect in reasonable detail; (iii) a description of the basis for each Title Defect; (iv) the Allocated Value of the affected Asset; (v) Buyer's estimate of the Title Defect Value; and (vi) inclusion and attachment of any supporting documentation with respect to the foregoing. For the purposes of Section 4.2(a), the term "supporting documentation" for a particular Title Defect means if the basis therefor is derived from any document a copy of such document (or pertinent part thereof), or if the basis is derived from any gap in Seller's chain of title the document preceding and following the gap will be attached, or in any other case documentation supporting the claim of such Title Defect, including computations.

[2] Section 4.2(b) of the PSA provides, in full:

> (b) Title Defect Adjustment to Purchase Price. Other than a Title Defect that affects the WI or NRI of a Lease, the number of Net Mineral Acres underlying a Lease, or what causes a lease to be a Shallow Lease (which is addressed in Section 4.9), if a Lease, Unit or Well is affected by a Title Defect that exceed the Title Deductible, the entire Asset will be excluded from the Assignments and the Purchase Price will be reduced pursuant to Section 2.4 except to the extent: (i) Seller cures such Title Defect prior to the Closing to Buyer's reasonable satisfaction that cure would enable Buyer to be conveyed Defensible Title to such Asset, (ii) Buyer agrees to waive such Title Defect, (iii) Seller, with Buyer's written consent, which Buyer may withhold in its sole discretion, elects on or before the Closing Date or no later than the end of the Cure Period to indemnify Buyer against any loss attributable to any such Title Defect, or (iv) Such Title Defect relates to an Easement, in which event Section 4.4 will apply. If a Title Defect affect the WI or NRI of a Lease, or the number of Net Mineral Acres underlying a Lease, the Purchase Price shall be proportionately reduced or proportionately increased as the case may be, if the working interest, net revenue interest, or number of net mineral acres of a Lease differs from the WI, NRI, or number of Net Mineral Acres of a Lease. Such Title Defect shall not in and off itself cause the asset to be excluded from the Assignments; provided, however, Buyer will not be obligated to accept any increase in the WI of any Lease or Well absent a proportionate increase in the NRI of the same Lease or Well.

Defect Notice on or before the Title Claim Date." *Id*. at § 4.2(c).[3]  Based on the date of execution

of the PSA, the Title Claim Date fell on Sunday, July 8, 2012.  The terms "Title Defect" and

"Title Defect Value" are defined in Section 4.1 of the Agreement. *See* PSA § 4.1(c), (d).

Article X of the PSA governs termination of the Agreement. Section 10.1 provides for

certain "Events of Termination."  In particular, Section 10.1 states:

> Events of Termination. At any time commencing on the date hereof and ending
> upon the occurrence of the Closing, and notwithstanding anything contained in
> this Agreement to the contrary, this agreement may be terminated in writing as
> follows:
>
> ….
>
> (b) by Buyer or Seller, notwithstanding anything contained in Article IV to the
> contrary, in the event that the aggregate amount of all Title Defect Values
> equals or exceeds 30% of the unadjusted Purchase Price.
>
> ….
>
> (e) by Seller … if Seller (i) has met all of Buyer's conditions to the Closing
> set forth in Section 9.2, (ii) is ready, willing and able to perform as
> contemplated by this Agreement on the Closing Date, and (iii) the Closing
> does not occur on the Closing Date because Buyer does not, or cannot as
> contemplated by this Agreement, perform on the Closing Date[.]
>
> ….

PSA § 10.1(b), (e).

Pursuant to the PSA, contemporaneously with the execution of the Agreement, Broad

Street deposited $3.5 million into an escrow account (the "Escrow Amount"). *See* PSA § 2.2.

The Escrow Amount is "non-refundable, except as provided for in Section 10.2" of the

Agreement, which governs "Automatic Terminations" due to no fault of either party.  *Id*.; §

10.2.[4]  Section 10.3, however, provides that the Escrow Amount is be returned in full to the

---

[3] Section 4.2(c) of the PSA provides, in full:

> (c) Title Defect Waiver. Notwithstanding anything to the contrary in this Agreement, Buyer shall
> be deemed to have waived any Title Defect as to which Buyer has not delivered to Seller a Title
> Defect Notice on or before the Title Claim Date.

[4] Section 10.2 of the PSA provides, in full:

Buyer in the event that "the Agreement is terminated by Buyer pursuant to any of Sections 10.1(a)-(d)," among other circumstances. In addition, Section 10.3 specifies that the Escrow Amount is to be paid in full to the Seller as liquidated damages, and is the exclusive remedy against the Buyer, in the event the Seller terminates the Agreement pursuant to Section 10.1(e).[5]

Article XIII of the Agreement contains various miscellaneous provisions. Section 13.15, entitled "Specific Performance," provides:

> Seller agrees that irreparable damage would accrue to Buyer in the event that any of the provisions of this Agreement are not performed by Seller in accordance with the terms hereof and that Buyer shall be entitled to specific performance of the terms hereof, in addition to, and notwithstanding, any other remedy at law or equity available to Buyer.

PSA, § 13.15. In addition, at Section 13.19, the parties included a "Time is of the Essence" provision, which acknowledges that one party's failure to perform timely its obligations under the contract may cause the other party substantial losses.[6]

---

> Automatic Terminations. Notwithstanding anything to the contrary herein, and unless further extended by a written agreement of the Parties on or before such date, in the even the Closing has not occurred by September 30, 2012 due to no fault of either Party, this Agreement shall automatically terminate.

[5] Section 10.3 of the PSA provides, in full:

> Termination of Escrow Account. In the event this Agreement is terminated by Buyer pursuant to any of Sections 10.1(a)-(d), or by Seller pursuant to Section 10.1(a) or Section 10.1(b) or this Agreement automatically terminates pursuant to Section 10.2, the Escrow Account will terminate contemporaneously therewith, Seller will not be entitled to any of the Escrow Amount, the Escrow Amount will be paid to Buyer without deduction therefrom, and Buyer will have no other recourse against Seller in connection with this Agreement, except as set forth in Article XII. In the event this Agreement is terminated by Seller pursuant to Section 10.1(e), the Escrow Amount will be paid to Seller without deduction therefrom, which payment will be considered for all purposes hereunder as liquidated damages, and Seller will have no other recourse against Buyer in connection with this Agreement, except as set forth in Article XII. In the event this agreement is terminated pursuant to Section 10.1(f), the Parties will determine the disposition of the Escrow Amount in such written agreement.

[6] Section 13.19 of the PSA provides, in full:

> Time is of the Essence. The Parties recognize that in the performance of their respective obligations each Party is relying on timely performance by the other, and will schedule operations

2. Purported Terminations and Current Dispute

Plaintiffs allege that, as early as March 2012, Broad Street began conducting a title review on the assets that were the subject of the PSA. (*Arthur Decl*., Doc. 15-1, at ¶ 12.) On Sunday, July 8, 2012, Endeavor contacted Broad Street by telephone, and informed them that Broad Street would provide Endeavor with written notice of certain Title Defects the following day.

On Monday, July 9, 2012, Endeavor delivered by facsimile and hand delivery a letter under the subject line "Title Defect Notice and Termination of Purchase and Sale Agreement." (*Arthur Decl*., Doc. 15-1, ¶ 10; *Termination Letter*, Doc. 15-6, 1.) The letter asserted that Broad Street had identified Title Defects on a total of 6,522.00 Net Mineral Acres comprising an aggregate Title Defect value of $19,566,000, or 55.9% of the Purchase Price. (*Termination Letter*, Doc. 15-6 at 1.) Broad Street then invoked termination of the Agreement pursuant to Section 10.1(b) of the PSA, and requested the return of the Escrow Amount pursuant to Section 10.3.  (*Id*.)  The letter was accompanied by documentation identifying 66 allegedly defective titles. (*Arthur Decl*., Doc. 15-1, at ¶ 11.) At the time Broad Street accepted delivery of these materials, it signed a Receipt of Title Defect Notice acknowledging "that it received the box of materials labeled Title Defect Notices within the prescribed time allowed pursuant to Section 4.2(a) of the PSA." (*Id.* at ¶ 10-11.)

Broad Street contends that Endeavor had no right to terminate the PSA on these grounds because it did not issue proper Title Defect Notices by the Title Claim Date, and therefore waived any such defects, pursuant to Section 4.2(c).  Moreover, Broad Street asserts that it was ready, willing and able to close on the transaction by the Closing Date.  Therefore, Broad Street

---

and incur obligations to third parties in reliance on timely performance by the other Party to this Agreement, and may sustain  substantial loses by reason of any failure of timely performance.

argues that it has a right to terminate the PSA pursuant to Section 10.1(e), and retain the Escrow. Broad Street also asserts that specific performance is the customary equitable remedy in real estate transactions and therefore, it is entitled to specific performance here.

On August 6, 2012, Broad Street filed this breach of contract action against Endeavor. (Doc. 1.) Broad Street's Amended Complaint, (Doc. 8), asserts claims for relief for breach of contract. Count I seeks recovery of the Escrow Amount based on Endeavor's purportedly wrongful termination.  Count II seeks specific performance and damages relating to Endeavor's alleged breach of the PSA.

Broad Street moved for Summary Judgment on both claims. This Court heard oral argument from counsel for both parties, and these matters are now ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed.  R. Civ.  P.  56(c).  A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)). "All evidence and reasonable inferences 'must be viewed in the light most favorable to the party opposing the motion.'" *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Defendants' burden is satisfied if there is an absence of evidence to support Plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Street v.  J.C. Bradford & Co.*, 886 F.3d 1472, 1477-78 (6th Cir. 1989).

### III. LAW AND ANALYSIS

*A. Breach of Contract*

The PSA is "governed by and . . . construed under the laws of the State of Ohio." PSA, §

13.6.  Under Ohio law, interpretation of a written contract is a matter of law for initial

determination by the Court. *Construction Interior Sys., Inc. v. Marriott Family Rests., Inc.*, 984

F.2d 749, 754 (6th Cir. 1993) (applying Ohio law) (citing *Potti v. Duramed Pharms., Inc.*, 938

F.2d 641, 647 (6th Cir. 1991)); *see also Long Beach Ass'n, Inc. v. Jones*, 82 Ohio St. 3d 574, 576

(1998). Moreover, contract interpretation is turned over to the fact-finder only when the relevant

contact language is ambiguous, and the determination of whether a contract is ambiguous is

decided as a matter of law by the Court. *Potti*, 938 F.2d at 647 (applying Ohio law) (citing

*Uebelacker v. Cincom Sys., Inc.*, 549 N.E.2d 1210 (Ohio 1988); *Clarke v. Hartley*, 454 N.E.2d

1322 (Ohio 1982)). The court decides whether a contract is ambiguous as a matter of law.  *Id.*

(citing *D.L. Baker & Co. v. Acosta,* 720 F.Supp. 615, 618 (N.D. Ohio 1989)).

When confronted with an issue of contract interpretation, "the role of a court is to give

effect to the intent of the parties to the agreement," which is presumed to be "reflected in the

language used." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 33-34 (Ohio 2007)

(citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 714 N.E.2d 898 (Ohio 1999); *Kelly v.*

*Med. Life Ins. Co.*, 509 N.E.2d 411(Ohio 1987)).  Moreover, "a contract is to be read as a whole

and the intent of each part gathered from a consideration of the whole." *Id.* at 35 (citing *Foster*

*Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519 (Ohio

1997)). Thus, a court's construction should attempt to harmonize all provisions of the contract,

and should not dismiss any provision as inconsistent if there exists a reasonable interpretation

that gives effect to both.  *See Farmers' Nat'l Bank v. Delaware Ins. Co*., 94 N.E. 834, 839 (Ohio

1911) ("The plain rule of construction requires that every provision of a contract shall be given effect if possible."); *Expanded Metal Fireproofing Co. v. Noel Const. Co.*, 101 N.E. 348, 350 (Ohio 1913) ("No provision of a contract is to be disregarded as inconsistent with other provisions, unless no other reasonable construction is possible. A special provision will be held to override a general provision only where the two cannot stand together.")

Here, Plaintiff argues that Defendant breached the PSA by improperly terminating and repudiating the Agreement.  Defendant counters that it had the right to terminate under Section 10.1(b) of the Agreement because the aggregate of the Title Defect Values exceeded 30% of the deal's unadjusted Purchase Price. Specifically, Defendant asserts that the aggregate amount of all Title Defect Values was actually $19,566,000, or 55.9% of the unadjusted Purchase Price.

### 1. Requirements to Terminate Under Section 10.1(b)

Whether Defendant breached the PSA by improperly repudiating the contract turns on whether Defendant properly exercised its right to terminate under Section 10.1(b).  Section 10.1(b) of the PSA provides that the Buyer may terminate the Agreement in writing, "[a]t any time commencing on the date [of execution] and ending upon the occurrence of the Closing, and notwithstanding anything contained in th[e] Agreement to the contrary," and "notwithstanding anything contained in Article IV to the contrary, in the event that the aggregate amount of all Title Defect Values equals or exceeds 30% of the unadjusted Purchase Price."

The applicability of Section 10.1(b) hinges on the existence of "Title Defect Values." "Title Defect Value" is a defined term under Section 4.1 of the PSA.  Specifically, for the purposes of the Agreement, "the term 'Title Defect Value' means the amount by which the Allocated Value of a Lease, Unit, Well, or Easement has been reduced by a Title Defect."  PSA § 4.1(d).  A "Title Defect Value" must, therefore, be predicated on a "Title Defect."  Section 4.2(c)

8

of the Agreement, however, provides that, "[n]otwithstanding anything to the contrary in this Agreement, Buyer shall be deemed to have *waived* any Title Defect as to which Buyer has not delivered to Seller a Title Defect Notice on or before the Title Claim Date." *Id*. at § 4.2(c) (emphasis added).  Thus, a Title Defect that is not timely and properly noticed is not actionable under the Agreement. In the absence of an un-waived Title Defect, there can be no un-waived Title Defect Value.  By extension, absent any un-waived Title Defects, the aggregate value of actionable Title Defect Values cannot be equal to or in excess of 30% of the unadjusted Purchase Price – which is, of course, the condition precedent for terminating the Agreement pursuant to Section 10.1(b).

Defendant argues that Section 10.1(b)'s use of the phrase "notwithstanding anything contained in Article IV to the contrary" means that the right to terminate under Section 10.1(b) is not subject to the notice and waiver provisions found in Section 4.2.  As the Supreme Court has explained in the statutory interpretation context:

> The use of such a "notwithstanding" clause clearly signals the drafter's intention that the provisions of the "notwithstanding" section override conflicting provisions of any other section. Likewise, the Courts of Appeals generally have "interpreted similar 'notwithstanding' language ... to supersede all other laws, stating that '[a] clearer statement is difficult to imagine.'"

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993). Likewise, the Sixth Circuit has explained that "[t]he term 'notwithstanding' is defined as 'without prevention or obstruction from or by' or 'in spite of.'" *Deutsche Bank Nat. Trust Co. v. Tucker*, 621 F.3d 460, 464 (6th Cir. 2010) (citing *In re Thompson,* 372 B.R. 860, 863 (Bankr. S.D. Ohio 2007)).  Thus, in Section 10.1(b), the clause "notwithstanding … anything to the contrary" overrides any contrary or conflicting provisions in Article IV. The "notwithstanding" clause does not, however, operate to override non-conflicting or non-contrary provisions of Article IV.

9

Here, the process set forth in Section 4.2 for asserting and/or waiving Title Defects does not "conflict" with, nor is it "contrary" to, the right of termination established in Section 10.1(b). Rather, those provisions are easily reconciled and harmonized. *See Ottery v. Bland*, 536 N.E.2d 651, 652 (Ohio Ct. App. 1987) ("[O]ur construction of the contract should attempt to harmonize all the provisions rather than produce conflict in them.") (citing *Farmers Nat'l Bank*, 94 N.E. 834). Article IV defines when a Title Defect exists, PSA § 4.1(c), creates guidelines for determining the value of such defects, *id*. at § 4.1(d), and sets forth clear procedures by which Title Defects can be asserted, *id*. at § 4.2(a), or waived, *id*. at § 4.2.(c). The Agreement also authorizes certain specific remedies to address the problems posed by Title Defects. One remedy is an adjustment to the Purchase Price, which is subject to the Seller's right to cure the Title Defects prior to the Closing Dates. *Id*. at § 4.2(b). In addition, when the aggregate value of Title Defects is equal to or greater than 30% of the unadjusted Purchase Price, either party may invoke the more extreme remedy of terminating the Agreement. *See* PSA § 10.1(b). That termination remedy is, by its terms, not subject to the right to cure associated with price adjustment, *see id*., and may be invoked "[a]t any time" prior to Closing. PSA § 10.1.

Nothing about this dual remedial approach suggests that the remedy selected changes the procedure by which Title Defects are identified, valued, asserted, and/or waived. Indeed, Section 10.1(b)'s explicit reference to the defined term "Title Defect Value" confirms that the procedural elements of Article IV apply to the termination remedy. Moreover, if Section 10.1(b) were construed to mean that the right to terminate is *not* subject to Article VI's Title Defect procedures, this would create an unnecessary conflict with Section 4.2(c). Section 4.2(c) provides that, if a Title Defect Notice is not issued by the Title Claim Date, that Title Defect is waived "[n]otwithstanding anything to the contrary in this Agreement." If the absence of a

timely Title Defect Notice does not waive a Title Defect for the purposes of Section 10.1(b), that would be contrary to the rule set forth in Section 4.2(c).  By contrast, reading Section 10.1(b) as consistent with Article VI procedures harmonizes these provisions and avoids such a conflict.

Thus, the Court finds that the PSA unambiguously requires the Buyer to comply with the Title Defect procedures set forth in Section 4.2(a) and (c) in order to terminate the Agreement based on the aggregate Title Defect Values under Section 10.1(b).

### 2. Whether Defendants Properly Asserted Title Defects

The Court now turns to the question of whether the Title Defects cited by Defendants were properly asserted under Section 4.2(a), or whether they were waived pursuant to Section 4.2(c). Section 4.2(a) provides that, "[i]n order to assert a Title Defect, Buyer must deliver to Seller a written 'Title Defect Notice' as soon as possible but not later than 30 days prior to the Closing Date in connection with each Title Defect."  PSA § 4.2(a). Section 4.2(c) provides that "buyer shall be deemed to have waived any Title Defect as to which Buyer has not delivered to Seller a Title Defect Notice on or before the Title Claim Date."

To determine whether Defendant complied with the above procedures, the Court must consider two questions: 1) whether the Defendant's Title Defect Notices were substantively adequate; and 2) whether Defendant's Title Defect Notices were timely.

Whether the substance Defendant's Title Defect Notices complied with the strictures imposed by Section 4.2(a) is a question of fact.  Section 4.2(a) specifies that a Title Defect Notice must satisfy the following "conditions precedent":

> (i) identification of the affected Asset or Assets; (ii) a description of each Title Defect in reasonable detail; (iii) a description of the basis for each Title Defect; (iv) the Allocated Value of the affected Asset; (v) Buyer's estimate of the Title Defect Value; and (vi) inclusion and attachment of any supporting documentation with respect to the foregoing.

Plaintiffs argue that the 66 Title Defect Notices provided did not satisfy these requirements, while Defendants contend the Notices do comport with the terms of the PSA.  This genuine issue of material fact is not properly resolved at the summary judgment stage.

The Court now turns to the question of whether Defendant's Title Defect notices were timely. Plaintiff first argues that Defendant's Title Defect Notices were not timely because they were not delivered "as soon as possible."  In Plaintiff's view, the PSA contemplated a rolling notice of Title Defects in order to give Plaintiff a reasonable opportunity to cure each identified defect prior to the Closing Date, as described in Section 4.2(b).  Plaintiffs allege that, based on the documentation accompanying Defendant's July 9, 2012 Termination Letter, Defendants had notice of at least some of the alleged Title Defects as early as March 2012. Plaintiffs therefore argue that Endeavor did not raise its purported Title Defects "as soon as possible" as a matter of law, in breach of the PSA.

For this proposition, Plaintiffs rely on *Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau*, 725 N.E.2d 646 (Ohio 2000).  In *Ormet*, the Ohio Supreme Court considered a notice provision in an insurance contract which provided that, "[w]hen an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable." *Id*. at 653.  In determining the meaning of the phrase "as soon as practicable," the Court explained:

> A provision in an insurance contract requiring "immediate" notice means that the
> notice must take place "within a reasonable time under the circumstances of the
> case." Similarly, we have held that "[a] provision in an insurance policy requiring
> 'prompt' notice to the insurer requires notice within a reasonable time in light of
> all of the surrounding facts and circumstances." Thus, a notice provision requiring
> notice to the insurer "as soon as practicable" requires notice within a reasonable
> time in light of the surrounding facts and circumstances.

12

*Id*. at 655 (internal citations omitted) (quoting *Travelers' Ins. Co. v. Myers*, 57 N.E. 458

(Ohio 1900), overruled in part by *Employers' Liab. Assur. Corp. v. Roehm*, 124 N.E. 223

(Ohio 1919); *Heller v. Std. Acc. Ins. Co.*, 160 N.E. 707 (Ohio 1928); *Ruby v. Midwestern*

*Indemn. Co.*, 532 N.E.2d 730, 732 (Ohio 1988)). The Court further explained that

"[w]hile the question of whether the insured met the notice condition is usually a question

for the jury, an unexcused significant delay may be unreasonable as a matter of law." *Id.*

at 653.  *Ormet* concluded that the insured's delay was unreasonable as a matter of law

because the undisputed record showed that the insured had known of the water

contamination caused by its actions for more than twenty-five years before informing the

insurer.  *Id*. at 656-657.

Here, the PSA's use of the term "as soon as possible," PSA § 4.2(a), must

likewise "require[] notice within a reasonable time in light of the surrounding facts and

circumstances." *Ormet*, 725 N.E.2d at 655; *Goodyear Tire & Rubber, Co. v. Aetna Cas.*

*& Sur. Co.*, 769 N.E.2d 835, 842 (Ohio 2002).  Again, whether notice was given within a

reasonable period of time is a heavily fact-based inquiry. *See Goodyear*, 679 N.E.2d at

843 (distinguishing *Ormet* and finding that a genuine question of fact existed as to

whether ten year period between awareness of possible contamination and notice to

insurer was reasonable under the circumstances).  Although the record reflects that

Defendant possessed at least some documents related to some Title Defects as of

March/April 2012, a Title Defect Notice has multiple components and requires a range of

supporting documentation. *See* PSA § 4.2(a). Thus, it is not clear from the record that

Defendant had in its possession and withheld the components of complete Title Defect

Notices. Moreover, given the number of notices being prepared, and the volume of the

supporting documentation, a reasonable jury could find that it was not unreasonable for Defendant to take 2-4 months to deliver the Title Defect Notices.  On these facts, "[this Court is] not inclined to bypass the factfinder on the question of whether [] notice was unreasonably late." *Goodyear*, 769 N.E.2d at 843.

Plaintiff also argues that Defendant's Title Defect Notices were not timely because they were not delivered in writing by the Title Claim Date of Sunday, July 8, 2012.  It is undisputed that Defendant called Plaintiff on July 8 and verbally communicated that written Title Defect Notices and supporting documentation would be delivered the next day, and that Defendant did in fact deliver the referenced documents on Monday, July 9, 2012. Plaintiffs argue that this delay was unacceptable because of the Agreement's "Time Is of the Essence" provision.  *See* PSA § 13.19.  Defendants argue that this delay was reasonable given that the Title Claim Date was a Sunday and no mail or courier services were available to deliver the documents.   Defendants also argue that the delay was immaterial and did not prejudice Plaintiffs.

The PSA contains no general provision that addresses how the time periods referenced in the Agreement are to be computed. Thus, the PSA does not speak generally to the question of what happens when a deadline defined by a period of days is to be construed when the last day of the period falls on a Sunday. *Contrast* Fed. R. Civ. P. 6(a)(1)(C)("When the [time] period is stated in days ...if the period would end on a Saturday, Sunday, or legal holiday, the period continues to run until the same time on the next day that is not a Saturday, Sunday, or legal holiday."); Ohio R. Civ. P. 6(A) ("In computing any period of time ... [t]he last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday.").  Nor does Section 4.2 contain any specific guidance as to what happens when the

Title Claim Date falls on a Sunday.  Thus, Plaintiffs' assertion that the Title Defect Notices were untimely, and Defendant's contention that the Title Defect Notices were timely, both appear to be reasonable interpretations of Section 4.2(a). As such, the Court finds that the applicable deadline for the Title Claim Date is ambiguous as a matter of law. *See Potti*, 938 F.2d at 647 ("[T]he determination whether a contract is ambiguous is made as a matter of law by the court.") ("Ambiguity exists … where contract language is susceptible to two or more reasonable interpretations.") (citing *Wells v. American Elec. Power Co.*, 548 N.E.2d 995 (Ohio 1988)).

The parties' course of conduct in this regard confirms this conclusion.  Extrinsic evidence in the record shows that, at the time Plaintiff accepted delivery of the Title Defect Notice materials on July 9, 2012, it signed a "Receipt of Title Defect Notice" acknowledging "that it received the box of materials labeled Title Defect Notices within the prescribed time allowed pursuant to Section 4.2(a) of the PSA." (*Arthur Decl.*, Doc. 15-1, ¶ 10-11.) Thus, the Court concludes that the parties' intent with respect of the Title Claim Date is a disputed question of material fact which precludes summary judgment.  *See Potti*, 938 F.2d at 647  ("[W]hen the relevant contract language is ambiguous … the job of interpretation is turned over to the fact finder.").[7]  Nevertheless, should a fact-finder determine that the parties' intent was to set the last day of the notice period on Sunday, July 8, 2012, written notice provided on July 9, 2012 would be untimely in light of the "Time is of the Essence" provision in the contract.  *See Glickman v. Coakley*, 488 N.E.2d 906, 913-14 (Ohio Ct. App. 1984) (holding that, in option contract where

---

[7] Plaintiff's citation to *Hussey v. Daum*, No. 14246, 1994 WL 237476 (Ohio Ct. App. Jun. 1, 1994), is inapposite.  In *Hussey*, the Ohio Court of Appeals considered the whether the buyer in a real estate contract waived any defects pursuant to a clause that read: "FAILURE TO NOTIFY SELLER OF ANY DEFECTS BEFORE EXPIRATION OF THE INSPECTION PERIOD SHALL CONSTITUTE A WAIVER OF SUCH DEFECTS, AND PURCHASER SHALL TAKE THE PROPERTY 'AS IS' WITH RESPECT TO SUCH DEFECTS." *Id.* at *3.  The *Hussey* Court found that the buyer gave notice five days after the close of the 15-day notice period, and concluded that the failure to give timely notice waived any defects.  *Id.* at *4. Here, in contrast, the Court makes no finding as to when the notice period ended, because it finds the PSA to be ambiguous in that regard. In addition, because the notice period in *Hussey* ended on a Wednesday, that case does not speak to the question of computation of time under a contract when the last day of the notice period falls on a Sunday.

15

time was of the essence, contractual obligation to deliver notice by Saturday March 15 was not satisfied by Monday March 17 delivery).  If the Title Defect Notices were not timely, the Title Defects they reference are waived pursuant to Section 4.2(c) of the PSA.

Based on the above, the Court finds that there are genuine disputes of material fact as to whether Defendant properly asserted the alleged Title Defects pursuant to the procedures in Section 4.2(a) of the PSA, or whether the cited Title Defects were waived.   If a fact-finder determines that Defendant properly asserted Title Defects and, therefore, was entitled to terminate the Agreement under Section 10.1(b), Defendant's repudiation would not be in breach of the PSA.  Plaintiff's Motion for Summary Judgment on Defendant's alleged breach of the Agreement is, therefore, **DENIED**.

### B. Remedy

With respect to remedies, Plaintiff moves this Court to find that Plaintiff is both: 1) entitled to retain the Escrow Amount; and 2) entitled to specific performance.

Whether Plaintiff is entitled to the Escrow turns on whether Defendant breached the PSA. If a fact-finder determines that Defendant properly terminated the Agreement under Section 10.1(b), Defendant would be entitled to the entirety of the Escrow Amount. *See* PSA § 10.3 ("In the event this Agreement is terminated by Buyer pursuant to any of <u>Sections 10.1(a)-(d)</u>, … the Escrow Account will terminate contemporaneously therewith, Seller will not be entitled to any of the Escrow Amount, the Escrow Amount will be paid to Buyer without deduction therefrom.").

In contrast, if a fact-finder determines that Defendant was not entitled to invoke Section 10.1(b), Plaintiff would be within its rights to terminate the Agreement pursuant to Section 10.1(e).  *See* PSA § 10.1(e) ("[T]his Agreement may be terminated in writing … (e) by Seller … if Seller (i) has met all of Buyer's conditions to the Closing set forth in Section 9.2, (ii) is ready,

16

willing and able to perform as contemplated by this Agreement on the Closing Date, and (iii) the

Closing does not occur on the Closing Date because Buyer does not… perform on the Closing

Date[.]"). Section 10.3 of the PSA provides that, where the Agreement "is terminated by Seller

pursuant to Section 10.1(e), the Escrow Amount will be paid to Seller without deduction

therefrom, which payment will be considered for all purposes hereunder as liquidated

damages…." As such, Plaintiff would be entitled to the entirety of the Escrow Amount.

Nevertheless, even if Plaintiff is able to prove the Defendant breached the PSA, Plaintiff

would not be entitled to a remedy of specific performance. Plaintiff argues that specific

performance is appropriate here as the customary remedy for disputes involving real estate.

Indeed, as Ohio courts have explained:

> Generally where the subject matter of the contract is unique, there can be no
> adequate remedy at law. Any specific piece of land is unique, thus, there can be
> no adequate remedy at law. This rule applies to both vendee and vendor
> claimants. 'The purchaser in a contract for the conveyance of land has a right to
> specific performance because of the unique character of realty, and the vendor can
> invoke equity for the purpose of compelling the buyer to accept a conveyance and
> to pay the purchase money, since the rule is that the right to specific performance
> must be mutual.'

*Ruhlen v. Columbus First Realty Co.*, Case. No. 6-83-13, 1985 WL 9146, 6-7 (Ohio Ct. App.

May 17, 1985) (emphasis omitted) (quoting 49 Ohio Jurisprudence 2d (1961) 571, Specific

Performance, § k6).

Here, however, the specific contractual provisions of the PSA supersede the common law

norm. Section 10.3 of the PSA provides that, where the Seller terminates pursuant to Section

10.1(e), retention in full of the Escrow Amount "will be considered for all purposes hereunder as

liquidated damages, and Seller *will have no other recourse against Buyer* in connection with this

Agreement." PSA § 10.3 (emphasis added). Thus, if Plaintiff is correct as to how the Agreement

17

was terminated in the matter *sub judice*, Section 10.3 establishes that Plaintiff's exclusive remedy is retention of the Escrow Amount.

Moreover, Section 13.15 of the PSA, entitled "Specific Performance," provides "that Buyer shall be entitled to specific performance of the terms [of the Agreement], in addition to, and notwithstanding, any other remedy at law or equity available to Buyer."  Thus, although Section 13.15 stipulates that Defendant is entitled to specific performance in the event of the Seller's breach, that provision conspicuously omits any reference to specific performance as a remedy for the Seller. Hence, the canon of *expressio unius* dictates that in so drafting the PSA, the parties intended to elect asymmetric remedies for Buyer and Seller. *See State ex rel. Paluf v. Feneli*, 630 N.E.2d 708, 712 (Ohio 1994) ("*Expressio unius est exclusio alterius* is an interpretative maxim meaning that if certain things are specified in a law, contract, or will, other things are impliedly excluded.") (citing *Harris v. Atlas Single Ply Sys., Inc.*, 593 N.E.2d 1376, 1378 (Ohio 1992); *Vincent v. Zanesville Civ. Serv. Comm.*, 560 N.E.2d 226, 229 n.2 (Ohio 1990)).

Given the language of Section 10.3 and Section 13.15, the Court finds that the PSA is unambiguous that – if Defendant breached the Agreement and Plaintiff thus properly terminated under Section 10.1(e) – Plaintiff's exclusive remedy would be an award of the full Escrow Amount.  Plaintiff's Motion for Summary Judgment as to available remedies is, therefore, **DENIED**.

## IV. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**


<u>s/Algenon L. Marbley</u>
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATE: September 30, 2013**

19