IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **BROAD STREET ENGERGY CO.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 2:12-CV-711 |
| v. | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| **ENDEAVOR OHIO, LLC,** | : | |
| | : | Magistrate Judge Deavers |
| Defendant. | : | |
| | : | |

## **OPINION & ORDER**

This matter is before the Court on the Motion of Defendant, Endeavor Ohio, LLC ("Endeavor"), for Summary Judgment against Plaintiff, Broad Street Energy Company ("BSEC"). (Doc. 36). For the reasons set forth herein, Defendant's Motion is **DENIED.**

## **I. BACKGROUND**

The facts of this case were briefed at length in the Court's Opinion & Order on Plaintiff's Motion for Summary Judgment, filed on September 30, 2013. (Doc. 24). In the interest of judicial economy, the Court will limit discussion to background that is pertinent to Defendant's Motion for Summary Judgment.

*A. Factual Background*

Broad Street is an Ohio oil and gas operator that holds title to various mineral rights, oil and gas leases, easements, facilities, and other interests in lands and assets. In April 2012, Endeavor, the "Buyer," entered into contract with Broad Street, the "Seller," to purchase large portions of its land, oil, and gas assets for $35 million dollars (the "Purchase Price"). The parties executed this purchase and sale agreement ("PSA" or the "Agreement") on April 9, 2012. Closing was scheduled to occur 120 days after the execution of the PSA, or on August 7, 2012.

1

On Sunday, July 8, 2012, Endeavor contacted Broad Street by telephone, and informed it that Endeavor would provide Broad Street with written notice of certain Title Defects the following day. On Monday, July 9, 2012, Endeavor delivered by facsimile and hand delivery a letter under the subject line "Title Defect Notice and Termination of Purchase and Sale Agreement." (*Arthur Decl.*, Doc. 15-1, ¶ 10; *Termination Letter*, Doc. 15-6, 1). The letter asserted that Endeavor had identified Title Defects on a total of 6,522.00 Net Mineral Acres comprising an aggregate Title Defect value of $19,566,000, or 55.9% of the Purchase Price. (*Termination Letter*, Doc. 15-6 at 1). Endeavor then invoked termination of the Agreement pursuant to Section 10.1(b) of the PSA, and requested the return of the Escrow Amount pursuant to Section 10.3. (*Id.*). The letter was accompanied by documentation identifying 66 allegedly defective titles. (*Arthur Decl.*, Doc. 15-1, at ¶ 11). At the time Broad Street accepted delivery of these materials, it signed a Receipt of Title Defect Notice acknowledging "that it received the box of materials labeled Title Defect Notices within the prescribed time allowed pursuant to Section 4.2(a) of the PSA." (*Id.* at ¶ 10-11).

1. Relevant Contract Provisions

Article I of the PSA governs "Purchase and Sale." Section 1.2 of the Agreement addresses "The Assets," which "means all of [BSEC's] right, title, interest, and estate…subject to their respective terms and conditions and the terms and conditions of this Agreement" in "all oil and gas leases, oil, gas, and mineral leases, and/or related subleases, including [BSEC's] WI[1] and NRI,[2] described in "Exhibit A"[3]…in each case without restriction to depth." (Doc. 1-1, Purchase Sale Agreement, § 1.2(a)).

---

[1] WI is an abbreviation for working interest, and specifically refers to the "working interest set forth on Exhibit "A" and Exhibit "B." (Doc. 1-1, § 4.1).
[2] NRI is an abbreviation for the net revenue interest set forth on Exhibit "A." (*Id.*)
[3] Exhibit A, included within the PSA, is a list of Leases and Lands that are part of the Agreement. (*Id.*, at 58).

Article IV discusses "Title, Environmental, and Easement Matters." Section 4.2(b) governs "Title Defects:"

> Other than a Title Defect that affects the WI or NRI of a Lease, the number of Net Mineral Acres underlying a Lease, or what causes a lease to be a Shallow Lease (which is addressed in Section 4.9), if a Lease, Unit or Well is affected by a Title Defect that exceed the Title Deductible, the entire Asset will be excluded from the Assignments and the Purchase Price will be reduced pursuant to Section 2.4 except to the extent: (i) Seller cures such Title Defect prior to the Closing to Buyer's reasonable satisfaction that cure would enable Buyer to be conveyed Defensible Title to such Asset, (ii) Buyer agrees to waive such Title Defect, (iii) Seller, with Buyer's written consent, which Buyer may withhold in its sole discretion, elects on or before the Closing Date or no later than the end of the Cure Period to indemnify Buyer against any loss attributable to any such Title Defect, or (iv) Such Title Defect relates to an Easement, in which event Section 4.4 will apply. If a Title Defect affect the WI or NRI of a Lease, or the number of Net Mineral Acres underlying a Lease, the Purchase Price shall be proportionately reduced or proportionately increased as the case may be, if the working interest, net revenue interest, or number of net mineral acres of a Lease differs from the WI, NRI, or number of Net Mineral Acres of a Lease. Such Title Defect shall not in and off itself cause the asset to be excluded from the Assignments; provided, however, Buyer will not be obligated to accept any increase in the WI of any Lease or Well absent a proportionate increase in the NRI of the same Lease or Well.

PSA § 4.2(b).

Article V of the Agreement concerns the "Representations and Warranties of Seller." Section 5.5 governs "Leases," and states:

> "Except as set forth on Schedule 5.5, Seller has not received notice of nor has knowledge of any default under the terms and provisions of any of the Leases. To Seller's knowledge, all Leases are in full force and effect in all material respects. To Seller's knowledge, all royalties, overriding royalties, and any other production related interests have been disbursed in material compliance with all of the terms and conditions of the applicable Lease, Contract, or law, and all deductions from such oil and gas production proceeds have been deducted in material compliance with all of the terms and conditions of the applicable Lease,

3

>> Contract, or law. To Seller's knowledge, Seller owns the right, title, and interest in and to each of the Leases as set forth on Exhibit "A."

(*Id.*, § 5.5).

Article X of the PSA governs termination of the Agreement. Section 10.1 provides for certain "Events of Termination." In particular, Section 10.1 states:

> Events of Termination. At any time commencing on the date hereof and ending upon the occurrence of the Closing, and notwithstanding anything contained in this Agreement to the contrary, this agreement may be terminated in writing as follows:
>
> ….
>
> (d) by Buyer, if Buyer (i) has met all of Seller's conditions to Closing set forth in Section 9.1, (ii) is ready, willing, and able to perform as contemplated by this Agreement on the Closing Date, and (iii) the Closing does not occur on the Closing Date because Seller does not, or cannot as contemplated by this Agreement, perform on the Closing Date[.]

PSA § 10.1(d).

Article XIII of the PSA is titled, "Miscellaneous." Section 13.12 discusses, "Materiality:"

> The terms 'material' or 'materiality used in connection with any representation, warranty, covenant, or agreement made hereunder by either Party will, for purposes of determining whether a breach of any such representation, warranty, covenant, or agreement has occurred, mean a detriment of $25,000 to the non-breaching party.

PSA § 13.12.

*B. Procedural Background*

On August 6, 2012, BSEC filed a breach of contract action against Endeavor. (Doc. 1.) BSEC's Amended Complaint (Doc. 8) asserted claims for relief for breach of contract. Count I sought recovery of the Escrow Amount based on Endeavor's purportedly wrongful termination. Count II sought specific performance and damages relating to Endeavor's alleged breach of the PSA. On August 24, 2012, Endeavor filed its Answer and Counterclaim. (Doc. 5).

4

On November 13, 2012, BSEC moved for Summary Judgment (Doc. 15) on its Amended Complaint, which this Court subsequently denied. (Doc. 24). In the Opinion and Order, this Court held that the contract unambiguously required Endeavor to comply with the Title Defect procedures set forth in § 4.2(a) and (c) in order to terminate the Agreement based on the aggregate Title Defect Values under § 10.1(b). (*Id*. at 11). Additionally, this Court found that there were genuine issues of material fact regarding whether Endeavor properly asserted the alleged Title Defects pursuant to the procedures in § 4.2(a) of the PSA, or whether the Title Defects were waived. Finally, this Court held that the contract permitted only Endeavor, not BSEC, to pursue specific performance as a remedy for breach.

On January 20, 2014, Endeavor moved for Summary Judgment on its Counterclaim. Endeavor's Amended Answer and Counterclaim (Doc. 9) asserts a claim for declaratory judgment. Count I seeks return of the Escrow Funds to Endeavor, based on Endeavor's allegedly proper termination of the PSA. This Court heard oral argument from counsel for both parties, and these matters are now ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)). "All evidence and reasonable inferences 'must be viewed in the light most favorable to the party opposing the motion.'" *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Defendants' burden is satisfied if there is an absence of evidence to support Plaintiff's

5

case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Street v. J.C. Bradford & Co.*, 886 F.3d 1472, 1477-78 (6th Cir. 1989).

## III. LAW AND ANALYSIS

Defendant argues that BSEC committed a material breach of the Agreement, and failed to meet a condition precedent to closing. Specifically, Endeavor claims that BSEC breached the PSA the day it signed the Agreement, because BSEC did not own 100 percent of the working interest in the acreage BSEC represented it owned. Endeavor contends that BSEC's alleged breach relieves it from performing under the Agreement, thereby entitling Endeavor to terminate the PSA. Defendant, therefore, insists that BSEC's Complaint should be dismissed, and the escrowed funds should be returned to Endeavor.

Plaintiff asserts that defects in ownership are covered under the PSA. Moreover, Plaintiff notes that the Agreement established the mechanism for addressing title defects. Plaintiff maintains that, because the PSA addressed title defects, including those that remained uncured at closing, Endeavor's arguments concerning material breach, conditions precedent, and termination under § 10.1(d) are without merit.

### *A. The Assets Conveyed Under the PSA*

The parties' arguments, though multi-faceted, boil down to one key piece of information: what BSEC contacted to convey to Endeavor. To consider properly the Agreement, the Court must examine the relevant contract provisions. The PSA is "governed by and . . . construed under the laws of the State of Ohio." PSA, § 13.6. Under Ohio law, interpretation of a written contract is a matter of law for initial determination by the Court. (Doc. 24 at 7); *see Construction Interior Sys., Inc. v. Marriott Family Rests., Inc.*, 984 F.2d 749, 754 (6th Cir. 1993) (applying Ohio law) (internal citation omitted).

As this Court emphasized in its earlier Order, "[i]t is well settled that contracts must be read as a whole, and they must be interpreted in such a manner as to give effect to every provision." *Mead Corp. v. ABB Power Generation, Inc*., 319 F.3d 790, 797 (quoting *Prudential Ins. Co. v. Corporate Circle, Ltd.*, 658 N.E. 2d 1066, 1069 (1995)); (*see* Doc. 24 at 7).  A court's contract construction, therefore, should attempt to harmonize all provisions of the contract, and should not dismiss any provision as inconsistent if there exists a reasonable interpretation that gives effect to both.  *See Farmers' Nat'l Bank v. Delaware Ins. Co*., 94 N.E. 834, 839 (Ohio 1911) ("The plain rule of construction requires that every provision of a contract shall be given effect if possible").  For the Court to conduct a piecemeal reading of the contract would be disingenuous, and undermine the parties' contractual intentions.

Article I of the PSA governs "Purchase and Sale."  Section 1.2 of the Agreement addresses "The Assets," which "means all of [BSEC's] right, title, interest, and estate…subject to their respective terms and conditions and the terms and conditions of this Agreement" in "all oil and gas leases, oil, gas, and mineral leases, and/or related subleases, including [BSEC's] WI and NRI, described in "Exhibit A"…in each case without restriction to depth."  (Doc. 1-1, Purchase Sale Agreement, § 1.2(a)).  According to Endeavor, the language of § 1.2(a) makes clear BSEC's "specific, unambiguous representation that it held a "Working Interest" of "100%" of each asset."  (*Defendant's Reply*, Doc. 40 at 2).

Endeavor argues that, because BSEC purportedly never delivered the working interest on Exhibit A, BSEC breached § 1.2 and § 5.5.  Defendant, in making such a conclusion, neglects to consider fully § 5.5 together with § 1.2.  Section 5.5 governs "Leases," and BSEC's knowledge requirement.  Section 5.5 states, in relevant part:  "Except as set forth on Schedule 5.5, Seller has not received notice of nor has knowledge of any default under the terms and provisions of any of

7

the Leases…. To Seller's knowledge, Seller owns the right, title, and interest in and to each of the Leases as set forth on Exhibit "A." PSA § 5.5.  Section 13.13 of the PSA defines knowledge as: "(i) in the case of [Plaintiff], the actual knowledge after reasonable due inquiry by Geoffrey W. Arthur, William E. Arthur, Daniel Kosikowski, and Edward Butler." PSA § 13.13.

Plaintiff argues that, under the knowledge requirement set forth by § 13.13, which requires that Seller have "actual knowledge after reasonable due inquiry," PSA § 13.13, BSEC complied with the terms of the Agreement.  BSEC, then, is responsible for conveying 100 percent of its *known right, title, and interest in the oil and gas leases*.  Taking § 13.13 together with § 5.5 and § 1.2, the PSA dictates that, for the conveyance to be considered invalid, BSEC must have actual knowledge of a defect in the right, title, and interest of the leases.

### B. Title Defects and Section 4.2

BSEC admits that the purported ownership issues are at least Title Defects.  (*Plaintiff's Response*, Doc. 39).  Endeavor, however, goes further and refers to them as "complete failure[s] of ownership." (Doc. 36).  The parties do not define this term.  Indeed, the Court cannot locate any use of the term "complete failure of ownership" in Ohio law.  Nor does the contract between the parties define "own" or "ownership."  The Court, therefore, proceeds under the commonly accepted definition of ownership, that an owner is "one who has the right to possess, use, and convey something," and ownership is "the collection of rights allowing one to use and enjoy property, including the right to convey it to others." Black's Law Dictionary 1130-31 (7th ed. 1999).

Endeavor alleges that BSEC's breach is evidenced by its reference to Exhibit A and a promise to convey a 100 percent working interest in each of the assets, but lack of reference to § 4.2.  Conversely, BSEC proffers that § 4.2 provides for various Title Defects, some which would

8

negatively impact the working interest, that the parties anticipated encountering.  Moreover, BSEC claims that Endeavor ignores the provisions § 4.2(b), a section which provides for circumstances in which the parties encounter defects in title.

Such a dispute over the working interest is clarified by considering § 4.2 in addition to the other relevant sections.  Article IV governs "Title, Environmental, and Easement Matters," and § 4.2(b) specifically discusses "Title Defect Adjustment to Purchase Price."  It states:

> Other than a Title Defect that affects the WI or NRI of a Lease, the number of Net Mineral Acres underlying a Lease, or what causes a lease to be a Shallow Lease (which is addressed in Section 4.9), if a Lease, Unit or Well is affected by a Title Defect that exceed the Title Deductible, the entire Asset will be excluded from the Assignments and the Purchase Price will be reduced pursuant to Section 2.4 except to the extent: (i) Seller cures such Title Defect prior to the Closing to Buyer's reasonable satisfaction that cure would enable Buyer to be conveyed Defensible Title to such Asset, (ii) Buyer agrees to waive such Title Defect, (iii) Seller, with Buyer's written consent, which Buyer may withhold in its sole discretion, elects on or before the Closing Date or no later than the end of the Cure Period to indemnify Buyer against any loss attributable to any such Title Defect, or (iv) Such Title Defect relates to an Easement, in which event Section 4.4 will apply.

PSA § 4.2(b).  In particular, the PSA explains that:

> If a Title Defect affect the WI or NRI of a Lease, or the number of Net Mineral Acres underlying a Lease, the Purchase Price shall be proportionately reduced or proportionately increased as the case may be, if the working interest, net revenue interest, or number of net mineral acres of a Lease differs from the WI, NRI, or number of Net Mineral Acres of a Lease. Such Title Defect shall not in and off itself cause the asset to be excluded from the Assignments; provided, however, Buyer will not be obligated to accept any increase in the WI of any Lease or Well absent a proportionate increase in the NRI of the same Lease or Well.

*Id*.  The parties' specifically contracted for a situation in which BSEC may not knowingly own 100 percent of the working interest.  The price adjustment clause was included to allow the

parties to work together and to adjust properly the purchase price, rather than terminating the contract, in the event of defects in title.

Ultimately, the parties' dispute hinges on each party's understanding of what was being conveyed. Taking the contract as a whole, it is clear that it was all of BSEC's interest that was to be conveyed, not, as Endeavor proffers, all of the interest in general. Such an interpretation is further supported by the contractual provisions discussing actual knowledge, and price adjustment for title defects.

### *C. Material Breach*

Even though the defects noted by Endeavor fall within § 4.2(b), the Court must still consider whether the defects in title are so egregious as to constitute a material breach of the contract. Ohio courts consider five factors in determining whether a party has materially breach a contract:

> [T]he extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party.

*Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, 933 F. Supp. 2d 974, 1005 (S.D. Ohio 2013) (quoting *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App. 3d 170-71 (Ohio Ct. App. 1990)). But, "[t]he determination of whether a party's breach of a contract was a 'material breach' is generally a question of fact." *O'Brien v. Ohio State Univ.*, No. 06AP-946, 2007 WL 2729077, at *3 (Ohio Ct. App. Sept. 20, 2007) (internal citations omitted).

Here, the PSA includes a definition of materiality to be used to define a material breach:

> 'Material'…used in connection with any representation, warranty, covenant, or agreement made hereunder by either Party will, for purposes of determining whether a breach of any such

10

> representation, warranty, covenant, or agreement has occurred,
> mean a detriment of $25,000 to the non-breaching party.

PSA § 13.12.  According to Endeavor, it has incurred a detriment well over the requisite $25,000.  It claims that the detriment amounts to approximately $35,000,000.  BSEC, however, disagrees, stating that Endeavor is "simply wrong about what record title shows or what BSEC disclosed about its ownership interest."  (Doc. 39 at 3).

Such factual disputes amount to genuine issues of material fact, and must, therefore, be resolved by a jury.  Accordingly, the factfinder will decide whether BSEC did, in fact, commit a material breach of the contract.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **DENIED**.


**IT IS SO ORDERED.**

    s/Algenon L. Marbley
ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE

**Dated: April 22, 2014**

11